UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

NATHANIEL JAMAR HUDSON,

                    Plaintiff,                          Case No. 1:05-cv-32

v.                                                      Honorable Gordon J. Quist

PATRICIA CARUSO et al.,

                    Defendants.
_____/

## OPINION

       This was a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court dismissed Plaintiff's action on April 22, 2005, for failure to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a). This matter is before the Court upon Plaintiff's motion for relief from the Court's judgment of dismissal brought pursuant to Fed. R. Civ. P. 60(b) (docket #14). For the reasons set forth below, Plaintiff's motion for relief from judgment will be denied.

## Factual Allegations

       Plaintiff is incarcerated at the Bellamy Creek Correctional Facility (IBC). In his *pro se* complaint, he sues Michigan Department of Corrections Director Patricia Caruso and IBC Case Manager Lori Mitchell. Plaintiff's complaint arises out of three incidents related to his attempted purchase and possession of materials citing the Uniform Commercial Code (UCC). On March 30, 2004, Defendant Caurso issued and implemented Director's Office Memorandum (DOM) 2004-8 "Fraudulent Activities Involving the Uniform Commercial Code" in response to increased activity by prisoners engaging in carious schemes under the UCC for purpose of harassing staff, prosecutors,

judges and others.  Under the DOM, prisoners were "no longer authorized to have any books, pamphlets, forms or other material regarding actions that can be taken under the UCC; these materials shall be considered contraband since they can be used to facilitate criminal activity and pose a risk to the custody and security of the facility.  (This does not include publications in the law library, such as Michigan Complied Laws Annotated, that set forth the statute or provide a scholarly legal analysis of the UCC.)"  The same restriction was re-issued on January 1, 2005, as DOM 2005-5.  DOM 2005-5 later was superceded by the Prisoner Mail Policy, MICH. DEP'T. OF CORR., Policy Directive 05.03.118 (HH)(23) (eff. Jan. 1, 2006).[1]

Plaintiff claims that on September 13, 2004, he "attempted to order some legal materials pertaining to the U.C.C." (Compl., at 2.)  The case manager at the time, B. Rosen, referred the disbursement request to the head librarian, Norman Pearce, for approval.  Pearce refused to approve the request because it was UCC-related material, which was barred pursuant to DOM 2004-8.  On November 14, 2004, Plaintiff sought notarization of a letter directed to the Clerk of the Court for the 3rd Judicial Circuit Court, in which "requested specific delegations of congressional authority pertaining to U.S. incorporation and commercial claims with federal statutes over an ENS LEGIS etc in an attempt to begin the litigation aspect of the procedure." (*Id*.)  Upon inspection, the librarian confiscated the letter and issued a contraband removal slip.  Finally, on November 22, 2004, Plaintiff was taken into segregation and his property was inspected.  At that time, Corrections Officer B. Angel confiscated Plaintiff's "security agreements, hold harmless indemnity agreement, private

---

[1]Policy Directive 05.03.118(HH)(23) prohibits prisoners from receiving:

Mail regarding actions that can be taken under the Uniform Commercial Code (UCC) which could be used to harass or threaten another individual, including the filing of a lien against the individual. This does not include legal materials which set forth the statute or provide a scholarly legal analysis of the UCC.

agreement, default letter to the director P. Caruso, and at least 50 pages of information . . . ."  (*Id.* at 3.)

Plaintiff contends that DOM 2004-8 has impaired his right to contract under the UCC. He also asserts that the DOM violates his First Amendment right of access to the courts.  For relief, Plaintiff requests an injunction barring enforcement of DOM 2004-8, together with compensatory and punitive damages.

On April 22, 2005, the Court *sua sponte* dismissed Plaintiff's action for failure to exhaust his administrative remedies.  Plaintiff filed a motion for relief from judgment, which was denied by the Court on June 16, 2005.  Plaintiff did not appeal the decision to the Court of Appeals for the Sixth Circuit.  Plaintiff filed the instant motion on March 19, 2007.

Plaintiff filed a second action concerning UCC materials on November 7, 2006.  *See Hudson v. State of Michigan et al.*, 1:06-cv-799 (W.D. Mich.).  That action concerned events that occurred in 2006.  On November 28, 2006, the Magistrate Judge issued a report and recommendation to dismiss the complaint on grounds of immunity and failure to state a claim.  The Court issued an opinion and judgment on April 30, 2007, adopting the report and recommendation and dismissing the complaint.

### Discussion

I.    Motion for Relief from Judgment

A Rule 60(b) motion may be granted only for certain specified reasons:  (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or the like; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other

reason justifying relief from the operation of the judgment.  When none of these first five enumerated examples of Rule 60(b) apply, relief may only be available when exceptional or extraordinary circumstances are present.  *Cincinnati Ins. Co. v. Byers*, 151 F.3d 574, 578 (6th Cir. 1998).

In his motion, Plaintiff claims that he is entitled to relief from the Court's judgment under the Supreme Court's decision in *Jones v. Bock*, 127 S. Ct. 910 (2007).  In *Jones*, the Supreme Court  held "that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."  The Court also held that a total-exhaustion rule was an unwarranted departure from the general rule that "if a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad. Only the bad claims are dismissed; the complaint as a whole is not."  *Id.* at 921 (quotation and brackets omitted).  In addition, the Court rejected the requirements imposed by the Sixth Circuit that, in order to properly exhaust, all defendants named in the complaint must have been named in previous administrative grievances.  *Id.* at 922-23.  The Sixth Circuit recently held that relief should be granted to a prisoner whose action was dismissed as the result of the Sixth Circuit's "mistaken interpretation" of the exhaustion provision.  *Okoro v. Hemingway*, 481 F.3d 873 (6th Cir. 2007) ("As *Jones* makes clear, the precedent of our Court, upon which the district court relied in dismissing Okoro's complaint, was a mistaken interpretation of the Prisoner Litigation Reform Act.").

Even if Plaintiff is entitled to relief from the Court's judgment dismissing his action for lack of exhaustion, granting Plaintiff's motion would be futile because his complaint fails to state a claim upon which relief may be granted.

II.    Failure to State a Claim

Plaintiff claims that the seizure of his UCC materials pursuant to DOM 2004-5 violated his First Amendment right of access to the Courts.  In *Bounds v. Smith*, 430 U.S. 817

(1977), the Supreme Court recognized a prisoner's fundamental right of access to the courts.  While the right of access to the courts does not allow a State to prevent an inmate from bringing a grievance to court, it also does not require the State to enable a prisoner to discover grievances or litigate effectively.  *Lewis v. Casey*, 518 U.S. 343 (1996).  Thus, *Bounds* did not create an abstract, free-standing right to a law library, litigation tools, or legal assistance.  *Id.* at 351.  Further, the right may be limited by legitimate penological goals, such as maintaining security and preventing fire or sanitation hazards.  *See Acord v. Brown*, No. 91-1865, 1992 WL 58975 (6th Cir. Mar. 26, 1992); *Hadix v. Johnson*, No. 86-1701, 1988 WL 24204 (6th Cir. Mar. 17, 1988); *Wagner v. Rees*, No. 85-5637, 1985 WL 14025 (6th Cir. Nov. 8, 1985).

In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury."  *Lewis*, 518 U.S. at at 349; *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999).  The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355.  "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc).  Moreover, the underlying action must have asserted a non-frivolous claim.  *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis* changed actual injury to include requirement that action be non-frivolous).

Plaintiff fails to make a viable access to the courts claim because he cannot show the required actual injury.  With regard to the September 13, 2004 incident, Plaintiff claims only that he was attempting to order "some legal material pertaining to the UCC."  (Compl., at 2.)  Plaintiff describes the document seized on November 14, 2004, as "a letter to the clerk of the court, 3rd Judicial Circuit Court in which plaintiff requested specific delegations of congressional authority pertaining to U.S. incorporation and commercial claims with federal statutes over an ENS Legis etc in order to begin the litigation aspect of the procedure." (*Id.*)  And, on November 22, 2004, Plaintiff claims that the following property was seized:  "security agreements, hold harmless indemnity agreements, private agreements, default letter to the director P. Caruso, and at least 50 pages of information . . . ."  (*Id.* at 3.)  Plaintiff does not allege, nor can this Court discern, how the seizure of those documents resulted in actual injury to a non-frivolous criminal appeal, habeas corpus application, or civil rights claim.  Plaintiff's general assertion that he "was using the materials in criminal litigation" (Compl., at 2), is far too vague to satisfy the actual injury requirement.  Plaintiff, therefore, fails to state a claim for violation of his right of access to the Courts.

Likewise, Plaintiff fails to state a claim with regard to his First Amendment rights to send and receive mail or possess certain written materials.  It is well accepted that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545 (1979); *see also Turner v. Safley,* 482 U.S. 78, 84 (1987) ("[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"). Operating a prison, however, is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner,* 482 U.S. at 85.  Recognizing this, courts have consistently held that issues involving "the adoption and execution of policies and practices that in

[the] judgment [of prison officials] are needed to preserve internal order and discipline and to maintain institutional security" in most circumstances "should be accorded wide-ranging deference." *Flagner v. Wilkinson,* 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Wolfish,* 441 U.S. at 547); *see also Bazzetta v. McGinnis,* 124 F.3d 774, 779 (6th Cir. 1997) (issues involving prison administration are properly resolved by prison officials, and the solutions at which they arrive should be accorded deference).

When reviewing an inmate's claim of constitutional violation, courts must balance this policy of judicial restraint with the need to protect inmates' constitutional rights. *See Turner,* 482 U.S. at 85. The standard by which this balancing occurs was articulated by the *Turner* Court, which held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This standard represents a "reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Flagner,* 241 F.3d at 481 (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).

The *Turner* Court identified four factors that are relevant in determining the reasonableness of a challenged prison regulation:

1. there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2. whether there are alternative means of exercising the right that remain open to prison inmates;

3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

- 7 -

      4.      whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner,* 241 F.3d at 484 (quoting *Turner,* 482 U.S. at 89-91).  Failure to satisfy the first factor renders the regulation unconstitutional, without regard to the remaining three factors.  If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the actions at issue are reasonably related to a legitimate penological interest.  It should further be noted that the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."  Instead, the issue is simply whether the policies at issue are reasonably related to a legitimate penological interest. *Id.*

      The abusive practice of prisoners filing baseless liens and/or UCC financing statements for the purpose of harassment and credit impairment of the alleged debtor (almost always a state or federal official involved with securing the prisoner's incarceration) is well documented. *See, e.g., United States v. Gordon,* No. CV 205-158, 2005 WL 2237640 (S.D. Ga. Aug. 25, 2005) (prisoners filed "facially absurd" liens and UCC financing statements designed to harass and intimidate government officials in the performance of their duties); *United States v. Orrego,* No.04 CV 0008 SJ, 2004 WL 1447954 (E.D. N.Y. June 22, 2004) (prisoner purported to copyright his name, after which he filed fraudulent liens against various government officials for using his name without permission or payment); *Ray v. Williams,* No. CV-04-863-HU, 2005 WL 697041 (D. Or. Mar. 24, 2005) (prisoner engaged in fraudulent scheme by which he filed false UCC filings against government officials seeking payment for unauthorized use of his copyrighted name); *United States*

*v. Martin*, 356 F.Supp.2d 621 (W.D. Va. 2005) (prisoner filed fraudulent UCC financing statements naming himself as the secured party for a $108,000,000.00 debt owed him by various government officials); *United States v. Brum,* No. CIV. A. 105CV110, 2005 WL 1606584 (E.D. Tex. July 1, 2005) (prisoner filed fraudulent liens and UCC financing statements against the judge and prosecutor involved in his criminal conviction); *Cooperwood v. McDonald,* No. 2:05 CV 111, 2005 WL 1427718 (W.D. Mich., June 13, 2005) (prisoner filed a fraudulent lien "for infringement of his copyrighted name"); *United States v. Stouder,* No. 3:04-1044, 2005 WL 2715666 (M.D. Tenn. Sept. 2, 2005) (prisoner filed fraudulent UCC financing statements against government officials in the amount of $300,000,000.00).

That the Michigan Department of Corrections has a legitimate penological purpose in preventing such behavior cannot seriously be questioned. The challenged policy represented a rational means by which to achieve the legitimate goal of preventing prisoners from engaging in such fraudulent and illegal behavior. While the policy prevented prisoners from possessing "books, pamphlets, forms or other material regarding actions that can be taken under the UCC," prisoners were still permitted to possess "publications in the law library, such as Michigan Compiled Laws Annotated, that set forth the statute or provide a scholarly legal analysis of the UCC." The Court concludes, therefore, that there exists a "valid, rational connection" between the policies at issue and a legitimate governmental interest.

As for the remaining *Turner* factors, they do not weigh in Plaintiff's favor. The Constitution does not require that prison officials accommodate inmates' rights in the manner most convenient to inmates. *See, e.g., Jones,* 697 F.2d at 803. Rather, the Constitution instructs that prison officials may not infringe upon inmates' constitutional rights, unless necessitated by a

legitimate penological purpose. To the extent that the policy at issue constituted an infringement of Plaintiff's constitutional rights, Defendants have established that such was necessitated by a legitimate penological purpose.  Moreover, the resources of the MDOC are limited and the Court must accord "wide-ranging deference" to the solutions implemented by prison officials to combat the very serious problem of UCC-related fraud perpetrated by prisoners.  The Court concludes, therefore, that the challenged policy was reasonably related to legitimate penological interests and satisfies the relevant legal standard.  Therefore, Plaintiff has suffered no compensable infringement of his constitutional rights.

Plaintiff also claims that DOM 2004-5 "impair[ed] the obligation of contracts pertaining to the Uniform Commercial Code." (Compl., at 2.)  Plaintiff has not cited, nor is this Court aware of, any competent authority supporting his right to contract under the UCC during his incarceration.

Because Plaintiff's complaint fails to state a claim upon which relief may be granted, the Court will deny his motion for relief from judgment.

III.    Filing Fee

Plaintiff also argues that he is entitled to a refund of the filing fee in this case because it was dismissed in violation of *Jones v. Bock*.  Plaintiff seeks to have any amount paid in this case to be applied to Case No. 1:06-cv-799.[2]  The Supreme Court decided *Jones* more than a year after this action was dismissed.  Plaintiff has not cited, nor is this Court aware of any authority supporting

---

[2]Plaintiff was granted leave to proceed *in forma pauperis* in this case and Case No. 1:06-cv-799.  In this case, Plaintiff was assessed an initial partial filing fee of $10.57 and is required to make monthly payments when he has sufficient funds in his account until the $150.00 filing fee is paid in full (docket #7).  To date, Plaintiff has paid only $10.57.  In Case No. 1:06-cv-799, Plaintiff was assessed an initial partial filing fee of $11.84 when funds are available and is required to make monthly payments when he has sufficient funds in his account until the $350.00 filing fee is paid in full (docket #4).  To date, Plaintiff has not made any payments in Case No. 1:06-cv-799.

- 10 -

the proposition that a plaintiff is entitled to a refund of the filing fee as the result of a subsequent change in the law. Plaintiff's argument also implicates *Owens v. Keeling*, 461 F.3d 763, 773 (6th Cir. 2006), in which the Sixth Circuit held that "when a prisoner 're-files' a complaint raising the same prison conditions claims as a complaint that was initially dismissed without prejudice for failure to exhaust under the PLRA . . . the prisoner need not pay an additional filing fee under 28 U.S.C. § 914(a)." While both of Plaintiff's cases generally concern UCC materials, this action was filed only against Defendants Caruso and Mitchell and concerns events that occurred in 2004. Plaintiff filed his 2006 action against eight Defendants and makes factual allegations arising in 2006. Because Plaintiff's 2006 case does not assert the same claims against the same Defendants as the instant case, it is not a "re-filing" for purposes of *Owens*. Accordingly, Plaintiff is not entitled to a refund of the filing fee in either case.

## Conclusion

For the reasons set forth above, Plaintiff's motion for relief from judgment (docket #14) will be denied.

An Order consistent with this Opinion will be entered.

Dated:  August 16, 2007  　　　　　　  /s/Gordon J. Quist  
　　　　　　　　　　　　　　Gordon J. Quist  
　　　　　　　　　　　　　　United States District Judge

- 11 -